Filed 4/7/14  P. v. Russell CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ROBERT GERRY RUSSELL, <br><br> Defendant and Appellant. | H037744 <br> (Santa Cruz County <br> Super. Ct. No. M51085) |

Defendant Robert Gerry Russell, a repeat offender with a decades-long record of crimes, was convicted by a jury on charges arising out of his latest series of offenses, involving a traffic accident in which, while driving drunk, he struck a pedestrian who was walking in the road with his wife.  The jury returned felony and misdemeanor convictions based on the circumstances of the accident and defendant's failure to remain at the scene. The jury also found defendant guilty of failing to appear in court.  Defendant was sentenced as a third-strike offender and received a term of 50 years to life in state prison under the "Three Strikes" law.  (Pen. Code, §§ 667, subds. (b)-(i), 1170.12.)

On appeal, defendant claims the trial court (1) failed to address certain motions to replace his counsel; (2) invalidly imposed and stayed two sentencing enhancements; and (3) erred in denying his motion to dismiss one or more of the prior habitual-offender

convictions that led to the imposition of the long prison term.  Defendant also claims that his 50-years-to-life prison sentence constitutes cruel and unusual punishment.

We will order the judgment modified to strike two one-year enhancement terms that were imposed and stayed based upon defendant's prior confinement in prison.  As modified, we will affirm the judgment.

PROCEDURAL HISTORY

The jury convicted defendant of driving under the influence of alcohol and causing injury (Veh. Code, § 23153, subd. (a); count 1), driving with a blood-alcohol concentration over the legal limit of 0.08 grams of alcohol per deciliter of blood and causing injury (*id*., § 23153, subd. (b); count 2), leaving the scene of an accident (*id*., § 20001, subd. (a); count 3), driving under the influence of alcohol (*id*., § 23152, subd. (a); count 4), driving with a blood-alcohol concentration over the aforementioned legal limit (*id*., § 23152, subd. (b); count 5), and failure to appear in court (Pen. Code, § 1320.5; count 6).  The jury found true an allegation, appended only to count five, that defendant's blood-alcohol concentration exceeded 0.15 grams per deciliter.  (Veh. Code, § 23578.)  The convictions on counts one, two, three, and six were for felonies; those for counts four and five were for misdemeanors.

In a bench trial that followed, the trial court found true the allegations under the Three Strikes law that defendant had seven prior convictions that qualified as strikes. (Pen. Code, §§ 667, subds. (b)-(i), 1170.12.)  Defendant was sentenced as a third-strike offender and sentenced to a term of 50 years to life in state prison under the Three Strikes law.  (Pen. Code, §§ 667, subds. (b)-(i), 1170.12.)  Defendant's sentence consisted of two consecutive 25-years-to-life prison terms because the failure-to-appear charge involved

2

different facts and occurred on a separate occasion.[1]  Separately, and after imposing

sentence, the court also imposed, but stayed, two one-year sentencing enhancements

under Penal Code section 667.5, subdivision (b), for recidivism by a prior prison inmate.

FACTS

On September 25, 2009, someone driving a red Ford Mustang struck and injured

Om Anand, who was walking with his wife in a bicycle lane.  The person driving the

Mustang drove away after the accident.

After the vehicle had struck Anand, a witness saw the car roll onto a traffic island

and come to a stop.  At that time another witness noticed the car, which was sitting atop

the island.  This second witness was not aware the car had struck someone, but he did

notice that the windshield was damaged on the passenger side.  The second witness

glanced inside the car and later told police he discerned that the driver was a dark-

complexioned white or Latino man, 30 to 35 years old, with long, dark, wavy or curly

hair.  He also told police the driver's hair was down to his ears and neck and that he may

have had a mustache.  His view of the driver was obscured because it was dark and the

driver was talking on a cell phone, which partly blocked his view of the driver's face, but

he was able to clearly discern that the driver was the car's only occupant.

---

[1] Under the Three Strikes law, "If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to subdivision (e)." (*Id.*, § 667, subd. (c)(6).)  "The indeterminate term described in subparagraph (A) [in this case, 25 years to life imprisonment] shall be served consecutive to any other term of imprisonment for which a consecutive term may be imposed by law.  Any other term imposed subsequent to any indeterminate term described in subparagraph (A) shall not be merged therein but shall commence at the time the person would otherwise have been released from prison." (*Id.*, § 667, subd. (e)(2)(B).)

3

At trial, the second witness testified he could not discern the driver's race or age as he glimpsed inside the car in the aftermath of the accident, notwithstanding he had previously told a defense investigator the driver was African-American.[2]

After sitting atop the traffic island for a short period of time, the driver drove the car to a fire station two blocks away, and parked in such a way as to block the path of an emergency response vehicle that was responding to the accident scene. Firefighters, including a fire captain who testified at trial, noticed that the driver of the car was an African-American man; the captain testified that the driver appeared to be looking at a cell phone or other handheld electronic device. The captain also discerned that the man was light-complexioned with short hair and a thin black mustache, but he could not identify defendant in a photographic lineup.

About an hour after the accident, a Santa Cruz police officer saw the accident-involved vehicle. It was parked. As the officer pulled over, the driver initially drove away, but stopped at the officer's command. The driver was defendant; he was the car's only occupant. His speech was slurred and his eyes were "sleepy looking." He staggered out of the car, and, unable to maintain his balance, fell over. He twice claimed the cause of the accident was that someone had collided with him; he used an expletive to characterize the purported offending driver.

Field sobriety tests showed defendant had a "high level of impairment," and a later breath test at the police station showed a blood-alcohol concentration of 0.20 grams per deciliter, more than double the legal limit (Veh. Code, §§ 23152, subd. (b), 23153, subd. (b)). An expert witness qualified to give testimony on breath-based blood-alcohol testing testified that at the time of the accident defendant's blood-alcohol concentration would

---

[2] Defendant is African-American. He was 53 years old at the time of the accident and had short hair.

4

have been 0.23 or 0.24 grams per deciliter, which the jury would later be instructed was about triple the legal limit.

When defendant later went to retrieve personal belongings from his impounded car, he told the officer who helped with that process that he had been driving while intoxicated at the time of the accident and thought he had struck someone during the incident, but his memory of the accident was clouded by the degree of his intoxication. At a Department of Motor Vehicles hearing at which defendant sought to have his driver license restored, he told the hearing officer that he had consumed three beers and three shots of a liqueur before the collision, but that he had no recollection of the accident itself.

On the failure-to-appear charge, a court supervisor testified that defendant disobeyed a court order by failing to appear in court on July 7, 2010.

The defense did not dispute that the car belonged to defendant, that it (the car) was involved in the hit-and-run accident, or that defendant was drunk at the time of the accident. The defense did, however, dispute that defendant was the person driving the car, a necessary element for conviction on the intoxication-based and evasion offenses alleged in counts one through five. With regard to the failure-to-appear charge, the defense did not dispute that defendant failed to appear in court as ordered, but disputed that his failure was willful, a necessary element of that offense.

DISCUSSION

I.    Marsden *Issues*

A *Marsden* motion is a criminal defendant's motion to exercise the right under state law to replace, under certain adverse circumstances, appointed counsel with another lawyer. (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).) Defendant claims, accurately, that this state-created right also implicates his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution

5

and the equivalent guaranty in the California Constitution.  He claims the trial court erred under *Marsden* by ignoring his repeated requests to substitute his counsel.

Defendant made repetitive *Marsden* motions or *Marsden*-implicating communications.  As we will explain, the trial court was not required to conduct repeated *Marsden* hearings in response to each such communication.  More importantly, the trial court conducted *Marsden* hearings when the law called for it; thus, there was no state-law error or violation of defendant's constitutional rights.

A.    *Background*

On July 6, 2010, defendant made his first *Marsden* motion during motions in limine.  The court conducted a *Marsden* hearing.  Defendant told the court his defense counsel was "a wonderful man" but he wanted a different lawyer who would undertake further investigation of his case.  He asserted that any automobile incident in which he might be involved had been preceded by "racial overtones" in the form of poor service afforded to him and his wife at a bar earlier that day.  He suspected someone had doctored his drink at the bar, making his intoxicated state not entirely voluntary.  He wanted his attorney to research the history of any racial incidents at the bar.  He also complained that his blood-alcohol concentration test had not been signed by the police officer who administered it.

Counsel replied to the trial court that his investigator had been to the bar and contacted the employees who were working on the night of the accident.  None of them remembered defendant, and counsel knew of no past race-based incidents at the bar.  He also told the court that defendant wanted to move for a change of venue and a continuance, but he had explained to defendant that he saw no reason to bring these motions.  Counsel further told the court that defendant was concerned to reach a plea agreement, and that counsel had been trying to negotiate one, but so far the parties had not been able to reach agreement.

The trial court found defendant had not shown grounds to substitute counsel and denied the motion.

On January 5, 2011, defendant made a second *Marsden* motion. That same day, the trial court conducted a *Marsden* hearing on the second motion, at which it considered a list of complaints defendant had about his counsel. The court began by reciting the list:

"THE COURT: [¶] . . . I'm going to read it out loud.

" 'Counsel did not diligently and actively participate in the full and effective preparation of my case or investigate carefully all defenses of fact or law that may have been available.

" 'Counsel did not confer with me without due delay and as necessary to elicit matters of defense.

" 'He did not promptly advise me of my rights and take all actions necessary to preserve them.

" 'He did not make appropriate motions to suppress evidence.

" 'I was denied the effective assistance of counsel by reason of counsel's failure to perform according to the standards imposed,' parentheses, 'as by inadequate pretrial preparation.

" 'Counsel failed to advise me of my status, which deprived me of my right to meaningfully participate in my defense by moving to have counsel replaced or by representing myself.

" 'No defense strategy has been formulated'—I'm not sure this is the right word: '. . . are discussed at this late stage.

" 'Counsel failed to object or move to strike hearsay testimony introduced by the prosecution.

" 'Counsel did not file any pretrial motions.

" 'Counsel did not file any preliminary hearing motions, discovery motions, informal and formal points and authorities.

" 'Counsel did not investigate carefully all defenses of fact and law, and by not doing that, it resulted in withdrawing a crucial defense from the case.

" 'I requested maintenance and accuracy records for Breathalyzer machines and had they been properly serviced or calibrated. Officer also did not sign off on the Breathalyzer testing. I was told . . . it was nothing. I've learned that the Breathalyzer test could be inadmissible evidence.

" 'Counsel never questioned hearsay statements by an officer who had only two years on the force. It was never established if he had completed a training course certified by the Commission on Peace Officer Standards and Training. . . . The average officer needs at least five years law enforcement experience, plus the POST training, and the officer must be more than just a reader and have sufficient knowledge of the crime or circumstances under which out-of-court statements were made so as to meaningfully assist the magistrate in assessing the reliability of his statements. This was not challenged.

" 'Counsel was advised I was asleep in the car when arrested, not driving. Counsel told me no one would believe me because I was drunk and a police officer said I was.

" 'Counsel could have filed formal discovery points and authorities in support of a motion for discovery. I would have had access to radio transmissions and other evidence.

" 'I brought up moral turpitude involving police officers under *Brady versus Maryland* [(1963) 373 U.S. 83], and he acted like he was not aware of this case.

" 'I was charged with two crimes. Now I have ten, and I have no idea how I got them.

" 'Counsel advised me there was no difference between actually driving a car drunk or being asleep in the car. There is a difference.

" 'I was told by counsel there was no motion I could file to stop what was happening in court.

" 'On December 9th, at a bail hearing, the DA said eyewitnesses said the driver of the car was black. At the preliminary hearing, the first on-scene officer also lied about eyewitness testimony, until the transcript was read back to him, and he then stated eyewitnesses said the driver of the car on September 25th, '09 was white, and that was what other witnesses had said, and that information was reported to dispatch for APB [all-points bulletin].

" 'This is a point where Counsel has failed to declare prejudice against me. One of these men [is] lying about the eyewitness testimony.

" 'Counsel did fail to subpoena witnesses favorable to my defense. He deprived me of testimony critical to my defense.

" 'Counsel has failed to impeach witnesses. He has not presented any evidence at a motion or a writ hearing critical to my defense.

" 'Counsel has failed to declare prejudice against me at any time and, due to said failure, has taken on the role of a surrogate prosecutor against my interests.

" 'The record should clearly show that Counsel failed to research applicable law, and it has deprived me of a resolution of critical factual issues supporting my primary defense, and nothing he has done has been based on a tactical decision or judgment.

" 'I'm entitled to relief. I have shown Counsel has not provided adequate representation. Therefore, I feel I am entitled to the relief prayed for.'

"Did I read that correctly, Mr. Russell?

"THE DEFENDANT: Yes, ma'am.

"THE COURT: All right. Now, let's go through this."

After a lunch break, defendant withdrew his *Marsden* motion, stating he had "overreacted" in presenting these complaints. He "apologize[d] for wasting the Court's time."

Between February 4, 2011, and the start of trial on April 19, 2011, defendant wrote a number of handwritten letters to the trial court that are included in the clerk's transcript.

9

Three of the letters included a request for new counsel and/or complaints about counsel. These letters were dated February 21, March 14, and March 30, 2011.

In his February 21, 2011 letter, defendant, citing *Marsden*, asked the trial court to replace his counsel. He asserted counsel had failed to confer with him on defense strategy and had not moved for dismissal of his case based on purportedly perjured testimony given at two hearings even though he (defendant) knew the prosecutor had presented some of that testimony knowing it to be perjurious. We note that these assertions had been included in the second *Marsden* motion the trial court had begun to consider before defendant withdrew the motion.

On March 14, 2011, defendant wrote another letter to the court, which began: "I have yet again asked for separation from my lawyer. This is not a ploy to hinder [or] distract from the case at hand, but my life as well my family[']s lives are at stake and I have not received a rational understanding of my lawyer[']s actions." Defendant essentially repeated his written allegations from February 21 and raised an additional allegation that the court had also recited in the hearing on his second *Marsden* motion—that the prosecution had deliberately failed to disclose exculpatory evidence to the defense.

On March 30, 2011, defendant again wrote to the court, asserting, as he had during the hearing on his second *Marsden* motion, that defense counsel, in failing to "declare prejudice and/or conflict," had "taken on the role of a surrogate prosecutor." He also asserted that his counsel had failed to challenge a 1990 strike prior on the ground that his guilty plea in that case was defective. He asked the court to dismiss the case entirely.

On April 7, 2011, defendant was present in court. The trial court proceeded by stating that defendant had sent it more letters. It provided copies of some of these letters to counsel, although the record is not clear which ones were provided. The trial court told defendant it was not in a position to reply to either correspondence or questions. Defendant stated he "just wanted to bring it to the court's attention." The court noted that

10

defense counsel had filed a motion to set aside the information and stated, "that takes care of the issues that [defendant] wrote me about giving his concerns. We're going to have a hearing on the matter. We're going to have argument on the law and the Court has the transcript which has been provided."

Defendant did not interpose an objection to the trial court's statement that the issues he had raised in his various items of correspondence had been resolved. A fortiori, he did not mention *Marsden* after the court spoke.

Eight days later, the trial court conducted a hearing on the motion to set aside the information and denied it.

In August through October of 2011, after defendant had been convicted and was awaiting sentencing, he wrote more letters, both to the trial court and to his counsel. One letter to the court, dated August 4, 2011, states, "I have asked for new counsel[; I've outlined] my reasons in prior letters." The letter stated that defendant had been "sadly deceived by counsel" and that he cannot "trust counsel's tactics" or his "integrity." In another letter, file-stamped August 22, 2011, defendant complained further about counsel and moved for a post-conviction *Marsden* hearing. He maintained defense counsel had failed to adduce exculpatory evidence at trial and to ask for a favorable jury instruction. He concluded that because of counsel's "past ineffective assistance we have become embroiled in such an irreconcilable conflict that ineffective representation will continue." Defendant renewed his complaints about counsel in letters dated August 29 and September 30, 2011, citing *Marsden* in the August 29 letter.

On October 28, 2011, the trial court conducted a third *Marsden* hearing—this time to address defendant's post-conviction complaints.[3] Defendant asserted that defense

---

[3] Defendant does not raise a claim about the post-conviction *Marsden* proceedings. We describe them here to provide context.

counsel had presented no evidence despite his of risk of receiving a life sentence. He asserted that his wife could have supplied exculpatory evidence. He also asserted that counsel did not tell him about the defense strategy. Finally, he complained, in essence, that counsel failed to summon a potential witness who would have offered exculpatory evidence relating to the failure-to-appear charge.

The trial court denied defendant's motion. It found that "there was clearly effective representation at the trial." It explained its reasoning: "Tactical decisions are for the attorney to present. You may consider the evidence one-sided, Mr. Russell. That's probably because it was overwhelming[ly] against you, and the fact that you're disappointed and you would want a different outcome does not mean in any way that [counsel] was not an effective advocate on your behalf. He was . . . . unrelenting . . . but the truth is the evidence against you was overwhelming, and although you consider drunk driving to be an accident, the law does not consider it to be an accident, and although you were very focused on what you hoped would be a civil settlement with the victim such that you wouldn't have criminal charges, that doesn't mean that that's admissible evidence or that the charges against you could have been dismissed or that [counsel] did not pursue actively on your behalf every opening that he saw with respect to creating doubt on behalf of the different eyewitnesses and these kinds of things.

"With respect to the failure to appear and return to court, I think those circumstantial inferences were overwhelming as well. You failed to appear in the middle of your last jury trial, as the Court recalls. [¶] I do recall [counsel] presenting some evidence to the jury on this. There were some stipulations, if I recall, to some of the minutes, I believe."

Following counsel's agreement with the trial court that he had presented evidence on the failure-to-appear charge, the court summarized its findings: "So to the extent that he was able to produce something on your behalf, he certainly did, and I'm not going to find that there's been any suggestion that he did not vigorously and more than adequately

12

represent you at your jury trial." It then denied defendant's post-conviction *Marsden* motion.

### B. *Applicable Law*

#### 1. *State Law*

" 'When a defendant seeks substitution of appointed counsel pursuant to *People v. Marsden*, *supra*, 2 Cal.3d 118, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 230.)

"[A] trial court that 'denies a motion for substitution of attorneys solely on the basis of [its] courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of [its] discretion to determine the competenc[e] of the attorney.' " (*People v. Sanchez* (2011) 53 Cal.4th 80, 92.)

"[W]e do not necessarily require a proper and formal legal motion, but at least some clear indication by defendant that he wants a substitute attorney." (*People v. Sanchez*, *supra*, 53 Cal.4th at pp. 87-88.) "We do not find *Marsden* error where complaints of counsel's inadequacy involve tactical disagreements." (*People v. Dickey* (2005) 35 Cal.4th 884, 922.)

#### 2. *Federal Constitutional Law*

"Of course, the denial of a defendant's motion to substitute counsel implicates the Sixth Amendment. [Citation.] Although it is unclear whether defendant preserved this federal constitutional claim at trial, we assume for purposes of argument that he did." (*People v. Abilez* (2007) 41 Cal.4th 472, 490.)

13

B.    *Discussion*

We find no *Marsden* error.  As described, defendant gave the trial court a long list of complaints—the court recited 26 itemized complaints—and it held a hearing on them, with defendant ultimately withdrawing them and apologizing for undue consumption of court time.  Defendant's subsequent written complaints renewed those he had already withdrawn, and when the court said, on April 7, 2011, that it had taken note of his correspondence and believed a pending hearing would resolve his concerns, he remained silent, thereby acquiescing to that ruling.

"A trial court errs under *Marsden* by not affording a criminal defendant the opportunity to state all his reasons for dissatisfaction with his appointed attorney. [Citations.]  On the other hand, a defendant is not entitled to keep repeating and renewing complaints that the court has already heard."  (*People v. Vera* (2004) 122 Cal.App.4th 970, 980.)  "Defendant had been allowed to air his complaints [about counsel] . . . .  His renewal, one week later, of a similar accusation did not compel the court to conduct an additional hearing under *Marsden*" (*People v. Clark* (1992) 3 Cal.4th 41, 104); "the trial court was not required to afford a hearing each time defendant made the same accusations" (*ibid.*).

To hold differently would be to risk allowing creative defendants to engage in gamesmanship by means of " 'proclivity to substitute counsel' " (*People v. Williams* (2013) 56 Cal.4th 165, 194)—i.e., by making repeated and repetitious *Marsden* motions. (See *People v. Hill* (1983) 148 Cal.App.3d 744, 762, fn. 9 ["This court is not oblivious to the 'game' quality of many *Marsden/Faretta* proceedings."].)  Similar problems have arisen before, not just in *People v. Vera*, *supra*, 122 Cal.App.4th 970 and *People v. Clark*, *supra*, 3 Cal.4th 41.  (See *People v. Lynch* (2010) 50 Cal.4th 693, 719-721, disapproved on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-638, 643; *People v. Barnett* (1998) 17 Cal.4th 1044, 1082, 1090, 1103; *People v. Gallego* (1990) 52 Cal.3d 115, 158.)  The situation in *Clark* points to the abuse inherent in repetitive *Marsden*

14

claims: "Defendant's [interrelated *Marsden*, *Faretta*,[4] and ineffective assistance of counsel] claims that counsel was 'unprepared' were never substantiated. Defendant's own writings suggest that the claims of unpreparedness were an attempt to inject error into the record. Moreover, although defendant claimed that counsel neglected to interview 'hundreds' of witnesses, he failed to identify any such witness or to demonstrate any relevant testimony these unidentified witnesses might offer. Indeed, there is no reason to believe that defendant would have been satisfied with the services of any attorney appointed to represent him. [¶] In this case, any conflict between defendant and his attorney was manufactured by defendant himself. He refused to accept that there were any matters within the province of counsel to decide. He desired to control all trial decisions and to make his attorneys subservient to his whims. He has not shown the impairment of the right to effective assistance of counsel or that any lack of communication was the fault of anyone but himself." (*Clark*, *supra*, 3 Cal.4th at p. 118.)

A trial court should acknowledge receipt of a *Marsden* motion or other communication raising complaints about counsel in a way that implicates *Marsden*, if only to state that the motion or communication is repetitive, vexatious, or otherwise barred for procedural reasons. Doing so preserves for the record that the court was aware of the issue. The court here expressly acknowledged receipt of defendant's letters.

There is a significant question whether the correspondence received by the court in this case properly invoked defendant's *Marsden* rights. But even if defendant was raising another *Marsden* motion on April 7, 2011—something that is not clear, inasmuch as he never mentioned *Marsden* on that day—the court engaged in a direct colloquy with defendant about the concerns raised in his letters. As noted, defendant stated he "just

---

[4] *Faretta v. California* (1975) 422 U.S. 806 (criminal defendants generally entitled to represent themselves at trial).

15

wanted to bring it to the court's attention." The court responded to defendant, commenting that defense counsel had filed a motion to set aside the information. It stated, "that takes care of the issues that [defendant] wrote me about giving his concerns. We're going to have a hearing on the matter. We're going to have argument on the law and the Court has the transcript which has been provided."

This colloquy indicates that either defendant abandoned any motion he may have made, as he had done with his second *Marsden* motion, or he accepted the court's disposition of any such motion, since his underlying concerns had been addressed. It is not as if defendant was unaware of his *Marsden* rights on April 7, 2011. He had already made two *Marsden* motions and he would make another one months later, following his conviction. And it is not as if the court was inattentive to defendant's concerns about trial counsel. It repeatedly addressed his *Marsden* motions, before and after his conviction. We find no error.

As for defendant's constitutional claim, " '[R]ejection on the merits of a claim that the trial court erred . . . necessarily leads to rejection of the newly applied constitutional " 'gloss' " as well. No separate constitutional discussion is required in such cases, and we therefore provide none.' " (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1435.)

II.     *Postjudgment and Ex Parte Imposition and Staying of Two Prior-Prison-Term Sentencing Enhancements*

Defendant claims that the trial court erred under state law by imposing and staying two one-year sentencing enhancements under Penal Code section 667.5, subdivision (b), for recidivism by a prior prison inmate. The court did this after it had already imposed sentence. Defendant contends the operative information did not allege these two prior prison terms, nor were they proven.

Although the second amended felony complaint and the first information alleged the prison priors under Penal Code section 667.5, subdivision (b), the first amended information did not. Instead, it alleged prior serious felonies for purposes of the serious-

felony habitual offender sentencing enhancement scheme (Pen. Code, § 667, subd. (a)(1)) and the Three Strikes law (*id*., §§ 667, subds. (b)-(i), 1170.12). Nor did prior-prison-term allegations appear in a felony complaint in a separate case (F15950) arising out of this incident, with which this case (M51085) was consolidated (although there was no consolidated information).

At the bench trial on the allegations that defendant was a recidivist offender, the trial court removed the question of the prison priors from the issues contested, as follows:

"THE COURT: All right. I've got a copy of the Information in front of me, and we'll start with the special allegations of the prior prison terms.

"Shall we work that way?

"[DEFENSE COUNSEL]: Those are actually no longer relevant, Your Honor.

"THE COURT: Oh. Do they only relate to the GBI?"

The trial court was referring to great bodily injury allegations that the jury had found not true.

"[DEFENSE COUNSEL]: Yes.

"THE COURT: Okay. So then we'll go to the strike allegations."

The trial court later realized it was looking at the superseded information.

"THE COURT: I'm sorry, I'm looking at the Information, not the first amended. I apologize.

"[THE PROSECUTOR]: That's why you were asking about prison priors?

"THE COURT: Yes."

"[THE PROSECUTOR]: They are no longer there on the —."

There was no further discussion of prior-prison-term enhancements. The trial court and parties agreed that the prior serious-felony enhancement allegations (Pen.

17

Code, § 667, subd. (a)(1)) did not apply either and should be dismissed. That left only the Three Strikes allegations, on which the bench trial proceeded.[5]

At the sentencing hearing and pronouncement of judgment, held on December 2, 2011, the subject of the prison priors did not emerge and no enhancements based on them were imposed. Six days later, however, in a minute order dated December 8, 2011, the court, in an action for which neither defendant nor his counsel was present, found the prison priors true; it also had them recorded in the abstract of judgment. The court's minute order refers to the proceeding as involving an "ex parte action."

Thus, the prior-prison-term allegations were not contained in the operative charging document, nor were they presented to the jury or the trial court during trial for a factual determination of their truth. "In order to enhance the term of imprisonment for prior prison terms, they must be pleaded and proven. (Pen. Code, § 1170.1, subd. (e).)" (*People v. James* (1978) 88 Cal.App.3d 150, 161.) In addition, the prior-prison-term allegations were not imposed at the oral pronouncement of judgment, which controls over the clerk's minute order. (See *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Thus, there was no clerical error to correct following the sentencing hearing. (See *In re Candelario* (1970) 3 Cal.3d 702, 705; *People v. Kim* (2012) 212 Cal.App.4th 117, 124.) The two stayed prior-prison-term

---

[5] Although there is a reference to "only 2 prison priors found to be true" on the same page of the clerk's transcript as the page for a minute order following the trial court's findings on the Three Strikes allegations, it does not comport with the bench trial proceedings. And the page is confusing. It appears to be an amended page, the second in a two-page document. The first page is dated April 28, 2011, which is the date of the bench trial. The body of the second page continues the notations from the first page. But at the top of the second page, and that page only, is a header dated December 8, 2011, the date on which, many months after the bench trial, the trial court imposed (and then stayed) sentence on the prison priors. Finally, the portion of the page in which the text "only 2 prison priors found to be true" appears is preceded by a line of separation in which is embedded the text, "minute order end/mj."

allegations must therefore be stricken.  (See *People v. Gonzalez* (2012) 210 Cal.App.4th 724, 744; *People v. Botello* (2010) 183 Cal.App.4th 1014, 1029.)

III.    Romero *Motion*

The trial court denied defendant's motion, brought pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, to strike, in the interest of justice (Pen. Code, § 1385, subd. (a)), one or more of the findings that he suffered a prior conviction for purposes of the Three Strikes law.

A.    *Background*

In his written *Romero* motion, in a letter to the trial court, and at the hearing on the motion, defendant argued that a minimum sentence of 50 years was excessive given (1) his age; (2) the fact that he did not intend to harm the victim; (3) the passage of almost two decades since his last Three Strikes–eligible convictions (which, we note, were five convictions for a single episode involving first degree burglary, attempted murder, assault to commit rape, aggravated assault, and false imprisonment); and (4) his current nature, disposition, character, and outlook on life.  On appeal, he renews these arguments, noting that the sentence "is, for all intents and purposes, a death sentence. Appellant is now about 56 years old.  There is every likelihood that he will die in prison. The sentence is, i[n] effect, life without parole."  (Fn. omitted.)

In denying his motion, the trial court began by observing that defendant's current crimes were serious and that he had seven Three Strikes–eligible convictions.  The court summarized this record.  The most recent victim, Om Anand, had a significant brain injury and had lost the creative artistic faculties that had enriched his life before the accident.  His wife was suffering psychologically.  And the most recent series of prior offenses (first degree burglary, attempted murder, assault to commit rape, aggravated assault, and false imprisonment) involved an 85-year-old neighbor who was lucky to survive his sexual assault and strangulation of her.  He had previously served 17 years of an 18-year prison sentence for those crimes.  He attacked the elderly woman three days

19

after completing parole for molesting a six-year-old neighbor in 1977.[6] Another strike was for a first-degree burglary he committed in 1975, while still a teenager.[7]

The trial court also found that every applicable aggravating sentencing factor set forth in the California Rules of Court applied to defendant and there were no mitigating factors. The court stated that defendant was always explaining away his conduct and this time was no different. He "still calls this an accident," the court commented, implying defendant thought he either had no culpable mental state or a lesser one than the reckless mental state the law assigns to drunk driving (see *Downey Venture v. LMI Ins. Co*. (1998) 66 Cal.App.4th 478, 501; *Interinsurance Exchange v. Flores* (1996) 45 Cal.App.4th 661, 672 [both stating that "drunk driving, per se, is reckless conduct"]).

The trial court stated, in effect, that defendant was too dangerous to be allowed any further freedom. It was essential to ensure that "the community is protected from Mr. Russell." Defendant, the court opined, was "exactly the kind of person that the voters and the legislators envisioned when they voted in the Three Strikes Law."

### B.     *Applicable Law*

"[A] trial court's refusal to strike a prior under the Three Strikes law is properly reviewable under an abuse of discretion standard." (*In re Coley* (2012) 55 Cal.4th 524, 545.)

The Three Strikes law does not "restrict the power of a trial court acting on its own motion to dismiss a prior felony conviction allegation in the furtherance of justice." (*People v. Clancey* (2013) 56 Cal.4th 562, 582.) " '[T]he sentence that is actually

---

[6] Defendant had noted in his motion that he received an indeterminate sentence of three years to life for those crimes and served the minimum term.

[7] On appeal, defendant states that he was a juvenile at the time and implies that a juvenile-delinquency petition was sustained. In fact, however, he was an adult, although only 18 years old, and he appeared in the adult court system.

imposed under the Three Strikes law is frequently dependent upon the trial court's exercise of discretion in determining whether, in furtherance of justice, to strike any of the serious or violent prior convictions that have been charged by the prosecutor and, if so, how many prior convictions to strike.' " (*Ibid.*)  But that discretion is circumscribed. " '[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, "in furtherance of justice" pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes] scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' [Citation.] [¶] Thus, the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so.  In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*People v. Carmony* (2004) 33 Cal.4th 367, 377-378.)

When departing from the Three Strikes sentencing norm, "the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack.' " (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.)  "[T]he circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Ibid.*)  Only "in such an extraordinary case—where the relevant factors . . . manifestly support the striking of a prior conviction and no reasonable minds could differ" would "the failure to strike . . . constitute an abuse of discretion." (*Ibid.*)

21

The required extraordinary circumstances do not exist here. To summarize, defendant had proved to be a dangerous individual from his teenage years. He had left a number of victims in his wake over decades. The trial court could reasonably find that society needed to be protected from defendant and that incapacitation by long incarceration would serve that purpose. There was no abuse of discretion.

IV.     *Cruel and Unusual Punishment Claim*

Defendant claims that his sentence of 50 years to life imprisonment constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution and cruel or unusual punishment under article I, section 17, of the California Constitution. The basis for the claim is his contention that the sentence is disproportionate to his crimes and shocks the conscience. We conclude that the sentence imposed in this case does not constitute cruel and unusual punishment.

*In re Lynch* (1972) 8 Cal.3d 410 (*Lynch*) applied a three-pronged approach to determine whether under state law a particular punishment is disproportionate to the offense for which it is imposed. (*Id*. at p. 424). Under the first prong, a reviewing court considers the "nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*Id*. at p. 425.) Second, the court must compare the challenged punishment with that prescribed for more serious crimes in the same jurisdiction. (*Id*. at p. 426.) Finally, the challenged punishment is to be compared with punishments for the same offense in other jurisdictions. (*Id*. at p. 427.)

The federal constitutional test is unsettled. *Solem v. Helm* (1983) 463 U.S. 277 noted three factors that bear on a determination of whether a sentence is so disproportionate that it violates the Eighth Amendment's cruel and unusual punishments clause, namely "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (*Id*. at p. 292; see *Ewing v. California* (2003) 538 U.S. 11, 22 (lead opn. of O'Connor, J.).) But in *Lockyer*

*v. Andrade* (2003) 538 U.S. 63, the high court alerted the bench and bar that "Our cases exhibit a lack of clarity regarding what factors may indicate gross disproportionality." (*Id*. at p. 72.) *Lockyer* cautioned further that only "one governing legal principle emerges as 'clearly established' under [28 U.S.C.] § 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years." (*Ibid.*)

In *In re Coley*, *supra*, 55 Cal.4th at page 531 (see also *id*. at pp. 541-542, 543, 558-559, 562), the California Supreme Court adopted, or at least relied upon, a test employed by the lead opinion in *Ewing v. California*, *supra*, 538 U.S. 11: " 'the Eighth Amendment contains a "narrow proportionality principle," that "does not require strict proportionality between crime and sentence" but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime." ' " (*In re Coley*, *supra*, 55 Cal.4th at p. 542.) "[U]nder the approach . . . , '[a] court must begin by comparing the gravity of the offense and severity of the sentence. [Citation.] "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual. [Citation.]' " (*Ibid.*)

Courts are to examine "not only the offense in the abstract . . . but also 'the facts of the crime in question.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 479 (plur. opn. of Mosk, J.; accord, *id* at p. 489 (conc. opn. of Reynoso, J).) With respect to the crime, courts are to consider "the totality of the circumstances" (*ibid.*), including, as most relevant here, the consequences of the criminal behavior. (*Ibid.*) With respect to the offender, a court should ask whether "the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

In order to avoid infringing on constitutional proscriptions (U.S. Const., amend. V; Cal. Const., art. I, § 15) of placing a criminal defendant twice in jeopardy for the same offense, "sentence enhancements [have not] been construed as additional punishment for the previous offense; rather, they act to increase a sentence 'because of the manner in which [the defendant] committed the crime of conviction.' [Citations.] An enhanced sentence imposed on a persistent offender thus 'is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes' but as 'a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.' " (*Monge v. California* (1998) 524 U.S. 721, 728.) Accordingly, we consider whether defendant's current 25-years-to-life sentence for failing to appear in court is disproportionate—and in so doing we may consider his record of recidivism—but may not consider whether his prior crimes warrant additional punishment.

The ultimate question under *Lynch* is whether society would find a specific punishment jarringly extreme in light of the historical facts. Such a punishment is " 'out of all proportion to the offense' " (*Lynch*, *supra*, 8 Cal.3d at p. 424) and therefore "shocks the conscience and offends fundamental notions of human dignity" (*ibid*). As for federal law, the scope of the Eighth Amendment remains unclear, beyond the rule previously described that the "gross disproportionality principle is applicable to sentences for terms of years" (*Lockyer v. Andrade*, *supra*, 538 U.S. at p. 72). (See *Baze v. Rees* (2008) 553 U.S. 35, 48 (plur. opn.) [noting "the difficulty of 'defin[ing] with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted.' "].) Defendant essentially rests his claim on this ultimate question, calling a sentence of 50 years to life imprisonment meted out in part for failing to appear in court

on one day "just beyond the pale." He notes, accurately, that he complied with other court orders to appear on other days when he was out on $10,000 bail.[8]

Successful challenges to proportionality have been characterized by a state appellate court as an "exquisite rarity" (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196) and by the United States Supreme Court as few in the noncapital context. "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." (*Rummel v. Estelle* (1980) 445 U.S. 263, 272; see also *id*. at p. 282, fn. 27 ["Once the death penalty and other punishments different in kind from fine or imprisonment have been put to one side, there remains little in the way of objective standards for judging whether or not a life sentence imposed under a recidivist statute for several separate felony convictions not involving 'violence' violates the cruel-and-unusual-punishment prohibition of the Eighth Amendment."].)

The sentence imposed in this case is not unconstitutionally disproportionate. Defendant has seven prior strike offenses. Six of them stem from his appalling and depraved victimizations of a six-year-old girl and an 85-year-old woman. The probation report lists 15 felony offenses and six misdemeanors that defendant has accrued over decades of inability to conform to the law. Even after all of that, he created new victims in the persons of Om Anand and his wife. He has spent a lifetime proving himself to be a danger to others. Thus, defendant's sentence—which as a practical matter amounts to imprisonment with very little possibility of parole during his lifetime—is not disproportionate under the state-law test of *Lynch*, *supra*, 8 Cal.3d 410, under whose first prong we are to consider the "*nature of* the offense *and/or the offender*, with *particular regard to the degree of danger both present to society*." (*Id*. at p. 425, italics added.) The same is true, and for the same reasons, under the federal constitutional tests. Assuming

---

[8] Notably, the prosecution had asked for $575,000 bail.

that *Ewing v. California*, *supra*, 538 U.S. 11 contains the best available test (see *In re Coley*, *supra*, 55 Cal.4th 524), and even if it is true that defendant's sentence crosses the threshold of possible disproportionality that requires further inquiry—i.e., 25 years to life is too long for failing to appear in court—application of the rest of the *Ewing* factors makes clear that the sentence meets federal constitutional requirements.

The other two *Ewing* prongs, as described by *Coley*, are that "the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." (*Id*. at p. 542.) Neither helps defendant.

The Three Strikes law is severe and, even now, in the more lenient form passed by voters in 2012 following years of debate over the Three Strikes regime, continues to require the same punishment for any felony—not just violent or serious felonies—for a defendant similarly situated to defendant here: i.e., one who has been convicted of violating Penal Code section 288 or of attempted murder or who has previously received a life sentence. (*Id*., § 667, subd. (e)(1), (e)(2)(C), (e)(2)(C)(iv).)[9] Failing to appear in court on serious felony charges is not de minimis compared to other felonies for which a defendant with a background similar to defendant's would also face a sentence of 25 years to life imprisonment. Defendant's failure to appear set back the trial by many months, put in peril the memory of witnesses, caused the state to have to jail him, and suggested his desire to avoid responsibility for his actions, just as he had shown when he told a police officer shortly after the incident that another driver had struck him.

As for the question of sentences imposed in other jurisdictions, "defendant makes no effort to compare his sentence with . . . punishments in other states for the same

---

[9] In saying "similarly situated to defendant," we do not suggest that defendant *would* receive the same sentence under the current version of the Three Strikes law. That question is not before us and we do not attempt to arrive at an answer.

26

offense, which we take as a concession that his sentence withstands [that] constitutional challenge . . . ." (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231.)

Defendant's sentence is unquestionably long; it is unlikely he will ever regain his freedom. We are aware of the magnitude of the punishment, as was the trial court. But defendant has repeatedly violated criminal laws throughout his entire adult life except when in prison. California voters have decided that permanent incapacitation is not only warranted in some cases but is necessary before more people are victimized by an inveterate criminal offender, one of a class of people who "by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law." (*Rummel v. Estelle*, *supra*, 445 U.S. at p. 276.) " 'If increased penalties do not deter the repeat offender, then society is warranted in segregating that person for an extended period of time. [Citation.]' [Citations.]" (*People v. Romero* (2002) 99 Cal.App.4th 1418, 1432.)

### DISPOSITION

The judgment is modified to strike the two prior-prison-term enhancements imposed under Penal Code section 667.5, subdivision (b). The superior court is directed to order the clerk of that court to correct the abstract of judgment to reflect this change and then transmit a certified copy of the corrected abstract to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

_____
                                                        Márquez, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.



_____
Grover, J.

28